United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHELLEY R. WEEKLY,<br><br>          Plaintiff,<br><br>   v.<br><br>JO ANNE B. BARNHART,<br><br>          Defendant. | No. C06-02164 MJJ<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

Pending before the Court is Plaintiff Shelly Weekly's ("Plaintiff") Motion for Summary Judgment on behalf of her minor child, K.P. ("K.P."). (Doc. #14.) On March 24, 2006, Plaintiff filed a Complaint for Judicial Review of Decision of Commissioner of Social Security following the Commissioner's final decision denying her application for supplemental social security benefits pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). (Doc. #1)  On August 1, 2006, Plaintiff filed her Motion for Summary Judgment. On August 31, 2006, Defendant Jo Anne Barnhart, Commissioner of Social Security ("Commissioner"), filed a Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion. (Doc. #15.) On September 14, 2006, Plaintiff filed a Reply to the Commissioner's Opposition. (Doc. #16.)

For the following reasons, the Court **DENIES** Plaintiff's Motion and **GRANTS** the Commissioner's Cross-Motion.

**FACTUAL BACKGROUND**

Unless otherwise indicated, the factual background of the instant action is undisputed.

K.P. is the 14-year-old son of Plaintiff. Described by his teachers as polite, pleasant, considerate, cooperative, mature, and kind, K.P. suffers from Attention-Deficit/Hyperactive Disorder ("ADHD") and a learning disability.

On December 8, 2002, an application for Supplemental Security Income benefits ("SSI") was filed on behalf of K.P. ("claimant") by his mother. On June 25, 2003, the Social Security Administration ("SSA") denied the application initially. On December 19, 2003, the application was denied on reconsideration. A timely request for hearing was filed on K.P.'s behalf on February 20, 2004. On May 17, 2005, a hearing was held before Administrative Law Judge Donald F. Rector ("ALJ"). Ms. Weekly appeared and testified on K.P.'s behalf before the ALJ. Ms. Weekly was represented by April Davis, a non-attorney advocate associated with the Homeless Action Center of Berkeley, California. Psychologist Laura Levine, Ph.D., testified as a medical expert at the ALJ's request.

Prior to filing his SSI application, K.P. attended Peralta Elementary School in Oakland, California. In 1999, he was observed to be inattentive in class and highly distractible. K.P.'s grandmother stated his home situation was unstable and that, although K.P. had been on anti-depressants in the past, he was not at that time. In 1999, K.P.'s test results on the Achievement Tests were largely within the average range, but declined in April 2000. K.P.'s teacher noted that K.P. often seemed tired.

In 2002, K.P. was transferred to Emerson Elementary School in the Berkeley Unified School District, where he began fifth grade. In January 2003, he was assessed by education specialist Marilyn Siegel for special education services. K.P.'s mathematical scores were within average range, while his reading scores were below age- and grade-level expectations, but still within the average range. K.P.'s scores in written expression were below average.

In February 2003, K.P. was evaluated by school psychologist Richard Anderson. Dr. Anderson found K.P. to display a broad range of affect appropriate to the situation. K.P. appeared goal-directed with good impulse control and functional tolerance. Academic achievement

2

1  measurements indicated K.P. was performing below grade-level in all academic areas. While K.P.'s
2  functioning was within the average range of cognition, there was a significant discrepancy between
3  cognitive ability and academic achievement in written expression. Dr. Anderson noted evidence of a
4  psychological processing disorder and felt K.P. had a learning disorder. Dr. Anderson also felt the
5  attention problems reported in school supported a diagnosis of ADHD. He noted that K.P.'s
6  frequent absences from school, unstable home environment, personal and family issues, ADHD, and
7  learning disability possibly impacted K.P.'s learning abilities. Dr. Anderson recommended
8  supplemental academic support and individualized or small group instruction with goal-directed and
9  structured approaches to help K.P. maintain focus in class.
10         On April 28, 2003, K.P.'s fifth grade teacher, Jenny Weddle, completed a questionnaire for
11  the SSA. Ms. Weddle noted that K.P. had been absent approximately 15 times and tardy 25 times in
12  about 130 school days. Ms. Weddle rated K.P. in each of the domains used by the SSA in assessing
13  functional equivalence to the "Listings." Ms. Weddle noted K.P. had "serious problems" with math,
14  class discussions, and writing. She commented that K.P. received extra support from educational
15  staff but had a difficult time staying focused and working on most activities. Ms. Weddle also noted
16  K.P. had problems with interacting with others, although these do not rise to the level of "serious."
17  However, Ms. Weddle did note that K.P. has some serious problems with caring for himself,
18  particularly his difficulty with identifying and expressing his emotional needs, responding
19  appropriately to mood changes, using appropriate coping skills, and knowing when to ask for help.
20  Ms. Weddle noted that while K.P. had improved over the past year, he often seemed sad and tired in
21  class, but that his mood changed when not performing academic work.
22         On April 30, 2003, Brett Chun, LCSW completed a Mental Disorder Questionnaire.
23  Mr. Chun is Ms. Weekly's psychotherapist and supervises MSW Intern, Jennifer Bobrow, who
24  interviewed K.P. Mr. Chun described K.P. as a healthy-looking, polite, and considerate young boy.
25  Mr. Chun indicated K.P. was originally diagnosed with ADHD at Kaiser and was deemed eligible
26  for special education in February 2003 by Berkeley Unified School District. Mr. Chun reported K.P.
27  has some difficulty establishing intimacy with others and has a pronounced interpersonal
28  detachment. Mr. Chun noted K.P. has a history of depression and sadness and that K.P. was doing

3

1  poorly in school. Mr. Chun noted that while K.P.'s ADHD affects his school work, he did not feel it
2  interfered with K.P.'s daily activities. Mr. Chun noted that K.P. was not depressed at that time and
3  no diagnosis of affective disorder had been made. Mr. Chun noted that K.P.'s attention was poor
4  and required an organized structure. Mr. Chun's diagnosis was Adjustment Disorder with
5  Depressed Mood.

In June 2003, the Emerson Elementary School principal notified K.P.'s family that K.P. would be held back and placed in Ms. Weddle's fifth grade class for a second year. In November 2003, Ms. Weddle completed a second questionnaire for the SSA. Ms. Weddle noted that K.P.'s absences and tardiness had improved over the prior year. In the domain of "Acquiring and Using Information," Ms. Weddle reported two serious areas in math and written expression. K.P.'s class participation had shown improvements from the first assessment. In the domain of "Attending and Completing Tasks," K.P. improved in eight of the subsections, but deteriorated in the subsections concerning organization and completing tasks without careless error. K.P.'s biggest area of improvement was in the "Caring for Himself" domain. Ms. Weddle noted that although K.P. used to cry due to academic frustrations, he expressed his frustrations appropriately and became noticeably less frustrated. No problems were marked as "serious" in that domain.

The state agency medical consultants initially concluded K.P. had a marked limitation in only one domain, "attending and completing tasks," but, upon reconsideration, concluded K.P. had no marked limitations.

Ms. Davis, K.P.'s representative, submitted records from Kaiser Permanente showing prescriptions for generic Ritalin from September 2000 through November 2002. Accompanying charts were largely illegible and only covered May and June 1999. K.P.'s records from Berkeley Unified School District were also submitted, covering a period from May 3, 2004 to April 4, 2005. These records showed that while K.P.'s grades and functioning had improved, he still required a routine, stable and consistent environment.

### LEGAL STANDARD

Summary judgment is appropriate if there are no genuine issues as to any material fact and

4

1  the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court may
2  disturb the Commissioner's final decision "only if it is based on legal error or if the fact findings are
3  not supported by substantial evidence." *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992).
4  Substantial evidence is more than a mere scintilla, but less than a preponderance. *Magallanes v.*
5  *Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (internal quotations and citations omitted).
6  "[C]onsidering the entire record, [substantial evidence] is relevant evidence which a reasonable
7  person might accept as adequate to support a conclusion." *Matthews v. Shalala*, 10 F.3d 678, 679 (
8  9th Cir. 1993). Determinations of credibility, resolution of conflicts in medical testimony, and all
9  other ambiguities are to be resolved by the ALJ. *Magallanes*, 881 F.2d at 750. The ALJ's decision
10 will be upheld if the evidence is "susceptible to more than one rational interpretation." *Andrews v.*
11 *Shalala*, 53 F.3d 1035, 1040 (9th. Cir. 1995).

## ANALYSIS

### 1. The ALJ's Final Decision

14 The ALJ analyzed Plaintiff's application applying the SSA's three-step evaluation process
15 for minors under the age of 18. *See* 20 C.F.R. §§ 416.924, 416.924a, 416.924b, and 416.929. At
16 Step One, the ALJ determines whether the claimant is engaged in a substantially gainful activity. 20
17 C.F.R. § 416.924(a). If the claimant is not engaged in a substantial gainful activity, at Step Two, the
18 ALJ will consider whether the claimant has a physical or mental impairment(s) or combination of
19 impairments thereof that is severe. *Id.* At Step Three, if the claimant has a severe mental or
20 physical impairment, the ALJ will determine whether the severe impairment that "meets, medically
21 equals, or functionally equals the listings." *Id.* If the claimant has a severe impairment that does not
22 meet or medically equal any listing, the SSA will decide whether the impairment "results in
23 limitations that functionally equal the listings." 20 C.F.R. § 416.926a(a). A child applicant
24 "functionally equals" a listing if he has an impairment(s) that result in "marked" limitations in two
25 "domains of functioning" or one "extreme" limitation in one domain. *Id.* The claimant will be
26 declared disabled if the claimant has a severe mental or physical impairment(s) and the impairment
27 meets the duration requirement. 20 C.F.R. § 416.924(a). If the claimant's severe ailment does not
28 meet, medically equal or functionally equal the listings or the duration requirement is not met, the

claimant will not be declared disabled. *Id.*

Applying the three-step process, at Step One, the ALJ concluded that K.P. has not engaged in any substantial gainful activity. (Tr. 25.) At Step Two, the ALJ considered documentary evidence provided by K.P.'s mother, medical providers and schools, as well as the state agency medical consultant and Dr. Levine. (Tr. 25-28.) The ALJ concluded that, based on the available evidence, K.P. has a "'severe' Attention Deficit Disorder and/or Learning Disorder impairment within the meaning of the Social Security regulations." (Tr. 28.)

At Step Three, the ALJ concluded K.P. has a "marked" limitation only in the domain of "Attending and Completing Tasks." (Tr. 28, 29.) Because K.P. has only one "marked" limitation, the ALJ concluded that K.P.'s impairments do not meet, medically equal, or functionally equal a listed Listing. Therefore, the ALJ concluded that K.P. is not disabled within the meaning of the Social Security regulations. (Tr. 29.)

**2.     Cross-Motions for Summary Judgment**

Plaintiff's Motion asserts two grounds for review. First, Ms. Weekly asserts the ALJ committed several legal errors in finding K.P.'s self-care limitations less than marked in Step Three. Second, Ms. Weekly contends the ALJ's rejection of a closed period of disability is not supported by substantial evidence. Plaintiff does not contest the ALJ's findings in Step Two that her son's impairments are severe. Nor does she contest the ALJ's findings in Step Three that he has marked impairments in the domain of Attending and Completing Tasks.

By Cross-Motion, the Commissioner contends that the ALJ did not err and that the ALJ's decision should therefore be affirmed.

**A.     The Self-Care Domain**

**i.     Whether the ALJ properly considered Ms. Weekly's testimony**

The first issue before this Court is whether the ALJ properly considered Ms. Weekly's testimony. At Step Three in his decision, the ALJ addressed Ms. Weekly's testimony: "Ms. Weekly testified that she still picks out the claimant's clothes for him and has to encourage him to eat. I do not doubt the veracity of her testimony, but do not agree with the claimant's representative that this constitutes a 'marked' limitation within the meaning of the Listings." (Tr. 29.) Plaintiff contends

6

1 this constitutes an implicit rejection of Ms. Weekly's testimony. The Commissioner asserts the ALJ
2 properly considered Ms. Weekly's testimony but that Plaintiff failed to meet her burden.

3 Plaintiff relies on *Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996) (where an ALJ rejects lay
4 testimony, he must provide specific reasons for doing so, germane to each witness), *Merrill v. Apfel*,
5 224 F.3d 1083 (9th Cir. 2000) (same) and *Smith ex rel. Enge v. Massanari*, 139 F. Supp. 2d 1128
6 (C.D. Cal. 2001) (same). In *Smolen*, the Ninth Circuit reversed a denial of benefits because the ALJ
7 improperly dismissed as biased lay testimony and erroneously assigned greater weight to the
8 medical evidence where the lay testimony was unsupported by medical evidence.[1] *Smolen*, 80 F.3d
9 at 1289. In *Merrill*, the Ninth Circuit reversed a denial of benefits where the ALJ's decision failed
10 to mention lay testimony that the claimant was completely incapable of walking on his own.
11 *Merrill*, 224 F.3d at 1086. In *Enge*, the district court reversed a denial of benefits because the ALJ,
12 in part, implicitly rejected lay testimony without providing a reason. *Enge*, 139 F. Supp. 2d at 1134.

13 All three cases are distinguishable from the instant case. In each case, the lay testimony
14 established that the claimant's symptoms matched the requisite level of severity, yet the ALJ's
15 decision either failed to make any mention of the testimony or improperly dismissed it. Unlike the
16 cited cases, the ALJ's decision here accepted Ms. Weekly's testimony but disagreed with Ms.
17 Davis's assessment that K.P.'s behavior rose to the level of a "marked" limitation. Ms. Weekly
18 testified that K.P. can be challenging to care for in that he has to be reminded to eat and change his
19 clothes. As the Commissioner argues, this is a "far cry from truly mentally or physically
20 handicapped children who cannot toilet themselves." (Doc. #15 at 5.) Because the ALJ properly
21 considered Ms. Weekly's testimony and provided a reason for rejecting Ms. Davis's assessment, the
22 ALJ did not commit legal error.

23         **ii.**      **Whether the ALJ properly considered structured environments**

24 The second issue before this Court is whether the ALJ properly considered the effect of
25 structured environments and other adaptations on K.P.'s ability to care for himself. A claimant's
26 need for structured settings is one factor to be considered in assessing the effects of a child's

27
28     [1] Where lay testimony is unsupported by medical evidence, the ALJ must develop the record by obtaining detailed descriptions of daily activities from third parties with specific knowledge or observation of the claimant's symptoms. *Smolen*, 80 F.3d at 1289.

1 impairment on his functioning. 20 C.F.R. § 416.924a(b)(5)(iv)(C).

2 Plaintiff contends the ALJ committed legal error by failing to properly consider K.P.'s need
3 for a structured environment. Specifically, she argues the ALJ failed to consider recommendations
4 by Mr. Chun, Ms. Weddle, and Ms. Lubin that K.P. required a structured, organized environment in
5 which to function. The Commissioner alleges Plaintiff's argument is without merit as she "fails to
6 specify in what manner, if any, error has resulted." (Doc. #15 at 5.)

7 Plaintiff's argument is unavailing. First, Plaintiff only seeks review of the ALJ's assessment
8 of K.P.'s ability to care for himself (Doc. #14 at 4), yet Plaintiff argues the ALJ simultaneously
9 ignored K.P.'s need for a structured academic environment and disregarded its role in his
10 improvements. K.P.'s need for structure supports Plaintiff's contention that his ADD and learning
11 disability have impacted his education. The ALJ's decision affirms this. However, as the
12 Commissioner argues, Plaintiff fails to establish how the ALJ's decision relied on legal error with
13 regards to K.P.'s ability to care for himself.

14 Second, as the Commissioner points out, the ALJ's decision reflects his consideration of
15 K.P.'s need for an structured academic environment. Although the ALJ need not discuss every piece
16 of evidence[2], the ALJ's decision demonstrates a thorough examination of the record. The ALJ noted
17 K.P. was first assessed for special education services in January 2003. (Tr. 26.) The ALJ noted Dr.
18 Anderson recommended that K.P. receive supplemental academic support in February 2003. (*Id.*)
19 The ALJ noted Ms. Weddle's first assessment, in which she commented that K.P. received extra
20 support from academic staff. (*Id.*) The ALJ mentioned Mr. Chun's April 2003 report, in which Mr.
21 Chun noted K.P.'s ADHD impacted his academic performance but not his daily activities. (Tr. 27.)
22 The ALJ then noted that K.P. repeated the Fifth Grade in 2003, as well as Ms. Weddle's second
23 assessment, in which she noted K.P. had improved, particularly in the area of "Caring for Himself."
24 (*Id.*) Finally, the ALJ noted that K.P.'s records from Berkeley Unified School District for the period
25 of May 2004 to April 2005 showed that despite a continuing need for "stability, routine and
26 consistency," K.P. "seems happier, and more engaged and focused." (Tr. 28.)

27 Therefore, because Plaintiff fails to establish the existence of legal error and the ALJ

28
---
[2] *Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003).

8

1 properly considered K.P.'s functioning in regards to his need for a structured academic environment,
2 the ALJ did not err.

### iii. Whether the ALJ properly considered K.P.'s BASC test score

The third issue before this Court is whether the ALJ properly considered K.P.'s Behavior Assessment System for Children (BASC) test. In deciding whether the claimant has a "marked" limitation, the ALJ must consider the available medical evidence, including "formal testing that provides information about your development or functioning." 20 C.F.R. § 416.926a(e)(1)(ii). When such scores are available, they will be considered in conjunction with information about the claimant's functioning to determine whether the claimant has a "marked" or "extreme" limitation in a particular domain. *Id.* While interpretation of the test score is primarily the responsibility of the administering professional, it is the SSA's responsibility to ensure the record is consistent and complete. 20 C.F.R. § 416.926a(e)(4)(iii). If there is a material inconsistency between the claimant's test records and other information in the record, the SSA will attempt to resolve it. *Id.* Therefore, the SSA "will not rely on a test score as a measurement of [the claimant's] functioning within a domain when the information [the SSA has] about [the claimaint's] functioning is the kind of information typically used by medical professionals to determine that the test results are not the best measure of [the claimant's] day-to-day functioning. When we do not rely on test scores, we will explain our reasons for doing so in [the claimant's] case record or in [the SSA's] decision." 20 C.F.R. § 416.926a(e)(4)(iii)(B).

Plaintiff argues the ALJ rejected K.P.'s BASC test scores without proper explanation, thereby committing legal error. Plaintiff alleges the BASC results demonstrate K.P.'s inability to care for himself. The Commissioner contends that although the ALJ did not discuss any of the test scores individually, but rather based his decision on the sum of Dr. Anderson's report, which found that K.P.'s unstable home environment, personal and family issues, ADHD and learning disability "might all contribute to his inability to sustain attention and motivation, and be influential in his ability to learn." (Tr. 26.)

Plaintiff's argument is unavailing. Plaintiff relies on *Mom v. Barnhart*, 2005 U.S. Dist. LEXIS 10034, *14 (N.D. Cal. 2005) (Chesney, J.), *Ray v. Chater*, 934 F. Supp. 347, 350 (N.D. Cal.

9

1996), and *Borgens ex rel. Borgens v. Halter*, 164 F. Supp. 2d 1309, 1312 (M.D. Fla. 2001). In *Mom*, the district court reversed a denial of benefits because the ALJ failed to explain his rejection of a standardized test score that supported the treating physician's conclusions. *Mom*, 2005 U.S. Dist. LEXIS 10034, *14. In *Ray*, the district court found the ALJ improperly disregarded one IQ test over another where the disregarded test, when considered with other consistent evidence in the record, would establish a "marked" limitation. *Ray*, 934 F. Supp. at 349-50. In *Borgens*, the district court, citing 20 C.F.R. § 416.926a, found the ALJ erred in failing to discuss what weight, if any, was given to the results of a single standardized test. *Borgens*, 1312-13.

The instant case is distinguishable on the basis that the BASC test was one of several tests administered by Dr. Anderson and discussed in his report. Plaintiff's cases involve situations where the ALJ either rejected test scores that supported a treating doctor's opinion (*Mom*), chose one test over another despite the fact that the evidence corroborated the rejected test's findings (*Ray*), or failed to discuss a test score (*Borgens*). Here, Dr. Anderson administered a battery of tests, the sum total of which Dr. Anderson found indicated K.P. has ADHD and a learning disability. The ALJ noted this in his report and accordingly found K.P. suffered a "marked" limitation in Attending and Completing Tasks, a finding consistent with the evidentiary record. Contrary to Plaintiff's assertions, Dr. Anderson's report does not indicate K.P. has any limitation in the self-care domain.

In sum, the ALJ did not reject the BASC scores as Plaintiff alleges. Rather, the ALJ properly considered Dr. Anderson's report in conjunction with the available evidence in finding that K.P. had only one "marked" domain.

### iv.    The Medical Expert's definition of "marked" limitations

The fourth issue before the Court is whether the ALJ properly relied on Dr. Levine's opinion. Plaintiff contends that Dr. Levine applied an improper standard in determining K.P. only had one "marked" limitation when she stated that "for something to be marked it would need to be severe in more than the few areas that that teacher has checked." (Tr. 258-59.) Plaintiff argues this standard, as articulated by Dr. Levine, contradicts the Social Security standard which state that a child's functional impairment may be "marked" even if the impairment affects only one activity. 20 C.F.R. § 416.926a(e)(2)(i).

The ALJ did not err in relying on Dr. Levine's opinion. In his decision, the ALJ credits Dr. Levine's opinion in concluding that K.P. has one "marked" limitation, but only because this opinion was "well supported by the documentary evidence, especially the reports of the claimant's teacher." (Tr. 29.) More fundamentally, the statement by Dr. Levine that Plaintiff challenges was directed at the functional areas set out in the Teacher's Questionnaire, not the six functional domains set out in 20 C.F.R. § 416.926a(b)(1)(I). Accordingly, Dr. Levine's articulated methodology in assessing K.P.'s functioning and the Teacher's Questionaire were not contradictory to the legal definition of "marked" under the Commissioner's regulations, and constituted an opinion that she was qualified to make.

### B. Closed Period of Disability

The last issue before the Court is whether the ALJ had substantial evidence to conclude a "closed period" of disability did not exist. Plaintiff contends the record sufficiently establishes a twelve-month period of disability. Specifically, Plaintiff argues that Ms. Weekly's testimony that K.P.'s onset date was in 1997, K.P.'s Kaiser records from 1999 note K.P.'s hypersensitivity, and K.P.'s 2000 prescription for generic Ritalin establish an onset of disability between 1997 and 2000.

Plaintiff's argument is unavailing, as Plaintiff failed to establish the required level of severity that would support a closed period of disability. As the Commissioner correctly argues, the diagnosis of a ADHD or prescription of medicine, contrary to Plaintiff's assertions, does not establish a disability. *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982). As Plaintiff failed to prove that K.P. was disabled for any continuous period, the ALJ's decision was amply supported by substantial evidence.

### CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff's Motion for Summary Judgment and **GRANTS** Defendant's Cross-Motion for Summary Judgment. The Clerk is **DIRECTED** to enter judgment and close the file.

**IT IS SO ORDERED.**

Dated: September 20, 2007

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE